BERNARD MANDELBAUM, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent MANDELBAUM v. COMMISSIONER
Docket Nos. 20517-92, 20678-92, 20687-92, 20688-92, 20689-92, 12749-94, 12750-94, 12751-94, 12752-94, 12753-94, 12754-94, 12755-94, 12756-94, 12757-94, 12758-94, 12759-94, 12760-94, 12761-94, 12762-94, 12763-94
United States Tax Court
T.C. Memo 1995-255; 1995 Tax Ct. Memo LEXIS 256; 69 T.C.M. (CCH) 2852; June 12, 1995, Filed *256 Decisions will be entered under Rule 155. Held: A 30-percent marketability discount is applied to determine the fair market value of certain shares of stock owned by each P on six valuation dates. Factors for determining marketability discount discussed. Held, further, Ps are not liable for additions to their 1987 and 1988 Federal gift taxes for valuation understatements under sec. 6660, I.R.C.Held, further, Ps are not liable for additions to their 1989 and 1990 Federal gift taxes for substantial gift tax valuation understatements under sec. 6662(a) and (g), I.R.C.
For petitioners: Henry M. Matri, David M. Kohane, and Thomas J. LaConte
For respondent: Clare W. Darcy. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: The subject cases were consolidated for trial, briefing, and opinion. Bernard Mandelbaum (Bernard), Leon Mandelbaum (Leon), Beverly Mandelbaum (Beverly), Max Mandelbaum (Max), and Pearl Mandelbaum (Pearl) petitioned the Court to redetermine respondent's determinations with respect to their 1986 through 1990 taxable years. [2] Respondent initially determined (and reflected in her notices of deficiency) the following deficiencies in Federal *257 gift tax and additions to tax under section 6660: [3]
Additions to Tax
Taxpayer
Year
Deficiency
Sec. 6660
Bernard
1987
$ 9,057
--  Leon
1987
38,761
--  Max
1987
37,772
--  Pearl
1987
36,911
--  Beverly
1987
38,761
--  Bernard
1988
47,033
$ 9,406
Leon
1988
49,410
9,882
Max
1988
43,308
8,662
Pearl
1988
43,308
8,662
Beverly
1988
49,410
9,882
Bernard
1989
25,833
7,750
Leon
1989
39,235
11,771
Max
1989
27,398
8,219
Pearl
1989
27,398
8,219
Beverly
1989
39,235
11,771
Bernard
1990
472,370
94,474
Leon
1990
752,715
150,543
Max
1990
10,451
2,090
Pearl
1990
486,023
97,205
Beverly
1990
11,292
2,258
*258 In her answers (including amendments thereto) for 1987, respondent asserted that the deficiencies in Federal gift tax and additions under section 6660 are as follows: Additions to Tax
Taxpayer
Deficiency
Sec. 6660
Bernard
$ 66,134
$ 19,840
Leon
122,401
36,720
Max
115,577
34,673
Pearl
114,579
34,374
Beverly
122,401
36,720
In her answers (including amendments thereto) for 1989 and 1990, respondent asserted that she had erroneously referenced section 6660 in the related notices of deficiency, instead of section 6662(a) and (g), and that the additions to the tax for those years are as follows: Additions to Tax
Taxpayer
Year
Sec. 6662(a) and (g)
Bernard
1989
$ 5,167
Leon
1989
7,847
Max
1989
5,480
Pearl
1989
5,480
Beverly
1989
7,847
Bernard
1990
122,284
Leon
1990
198,860
Max
1990
2,090
Pearl
1990
64,232
Beverly
1990
2,258
Following concessions, [4] we must decide: *259 1. What discount for lack of marketability should be applied to determine the fair market value of certain shares of stock owned by some or all of petitioners on the following valuation dates: December 31, 1986, December 16, 1987, December 23, 1988, December 15, 1989, February 1, 1990, and December 30, 1990. We hold the marketability discount is 30 percent on all of these dates. 2. Whether petitioners are liable for additions to their 1987 and 1988 Federal gift taxes for valuation understatements under section 6660. We hold they are not. 3. Whether petitioners are liable for additions to their 1989 and 1990 Federal gift taxes for substantial gift tax valuation understatements under section 6662(a) and (g). We hold they are not. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference. Each petitioner was a resident of New Jersey when he or she petitioned the Court. They each filed Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for the 1986 through 1990 taxable years. Each reported on Form 709 that he or she had made a gift of the stock of Big *260 M, Inc. (Big M), during the corresponding year. 1. The Mandelbaum Family
Leon, Max, and Bernard are brothers. Leon is married to Beverly, and they have four children: Kenneth, Beth, Joan, and Michael. Max is married to Pearl, and they have three children: Laurence, Alan, and Susan. Bernard is divorced and has three children: Ken, Lee, and Gini. We hereinafter collectively refer to these 15 people as the Mandelbaum family. 2. Big M
a. Background
Big M is a privately held, family-owned corporation that was incorporated as a C corporation under the laws of the State of New Jersey. Big M operated as a C corporation until it elected to be an S corporation effective with its taxable year beginning on July 26, 1987. Big M uses a fiscal year to report its income and expenses for Federal income tax purposes. Big M's fiscal year originally ended on the last Saturday in July. Big M changed its taxable year in July 1988 to a fiscal year ending on the last Saturday in January. b. Capital Structure
Big M was originally founded by Leon, Max, and Bernard. These three men, who initially were equal shareholders, were Big M's sole shareholders until 1976. In *261 1976, Leon and Max began transferring some of their Big M shares to their children. Bernard began transferring some of his Big M shares to his children in 1978. Big M stock has always been owned within the three branches of the Mandelbaum family formed by the brothers and their children. The Mandelbaum family does not plan to make Big M public, sell it, or seek nonfamily equity investors. Big M had one class of common stock outstanding in its 1986 and 1987 taxable years. This stock, totaling 9,643 shares, was owned by all members of the Mandelbaum family except for Pearl and Beverly. Big M restructured its corporate form during its taxable year ended July 30, 1988. Big M recapitalized, exchanging 9,643 shares of its common stock for 6 shares of its newly issued class A voting common stock and 9,637 shares of its newly issued class B nonvoting common stock. One share of class A voting stock each was issued to Leon, Bernard, Laurence, Kenneth, Ken, and Alan. [5] Shares of class B nonvoting stock were issued to each member of the Mandelbaum family in the same ownership percentages that they each had held before the recapitalization. All members of the Mandelbaum family, except *262 for Pearl and Beverly (who were not shareholders at that time), agreed that a share of class A stock would become a share of class B stock if it was transferred. These members also agreed that Big M's board of directors (the Board) could restore the voting rights to the transferred share if the transferee was a member of the Board. c. Type of Business
Big M operates predominantly in a single industry segment; i.e., women's apparel retail stores, in the States of New York, New Jersey, Pennsylvania, Delaware, Maryland, and Virginia. Bernard, Max, Leon, and their mother opened Big M's first store in 1950. All three brothers were actively involved in the business then, and they and their children continue to operate the business today. A number of the children are currently active in the management of the business on a full-time basis. The oldest of these children is Max's son, Laurence, who is currently Big M's chief executive officer and president. *263 Several of the grandchildren of Leon, Max, and Bernard also work in the business. Big M has two retail divisions: Mandee Shops and Annie Sez. [6] Mandee Shops offers popular-priced contemporary junior fashions. Its average store size is 8,000 square feet. Annie Sez offers off-price, designer, and brand name women's clothing. Its average store size is 15,000 square feet. Each store employs approximately 15 people. Big M employs between 3,500 and 4,000 people, depending on the season, including 250 at its Totowa, New Jersey, headquarters. Big M's stores are primarily situated in downtown locations of densely populated cities and "strip center" locations on major highways. Big M had the following number of stores as of the end of the years indicated: Year
Number of Stores
1983
48
1984
60
1985
71
1986
105
1987
110
1988
107
1989
115
1990
122
Retail sales of women's apparel is highly competitive. Competition *264 relates to price, style, selection, quality, display, customer service, and store location. Mandee Shops and Annie Sez have different competitors. Their competitors include specialty stores, department stores, factory outlet malls, and mills projects. Big M purchases practically all of its merchandise on the open market from various suppliers. Big M maintains sufficient inventory in its stores throughout the year, and it promotes its goods to the public through different methods of advertisement, such as radio, television, and newspapers. Big M accepts national credit cards and offers layaway plans. d. Management
On November 4, 1982, Big M and its then shareholders (i.e., all members of the Mandelbaum family except Beverly, Pearl, Lee, and Gini) executed an agreement (First Agreement). The First Agreement required that Laurence be elected as Big M's president; that Leon be elected as vice president and chairman of the Board; and that Bernard be elected as secretary and vice chairman of the Board. The First Agreement was revoked by a second agreement (Second Agreement) dated June 13, 1988. The Second Agreement was executed by Big M and its then shareholders; i.e., all *265 members of the Mandelbaum family except Beverly and Pearl. The Second Agreement required that Laurence be elected as Big M's president; that Leon be elected as vice-president and chairman of the Board; that Bernard be elected as secretary, treasurer and vice chairman of the Board; that Kenneth be elected as vice president of real estate; that Ken be elected as vice president of retail operations; and that Alan be elected as vice president of merchandising. 3. Freely Traded Values of Big M Stock[7]
The freely traded values of 1 share of the 9,643 shares of Big M common stock outstanding on December 31, 1986, and December 31, 1987, were $ 7,505 and $ 6,631, respectively. The freely traded values of 1 share of the 9,637 shares of Big M class B common stock outstanding on December 23, 1988, December 15, 1989, February 1, 1990, and December 30, 1990, were $ 7,376, $ 8,675, $ 7,325, and $ 4,397, respectively. *266 4. Shareholders' Agreements
The First Agreement and the Second Agreement (collectively referred to as the Shareholders' Agreements) were executed with respect to Big M's stock. The Shareholders' Agreements were prepared by Big M's outside counsel, Arne Siegel (Siegel), [8] and Big M's outside accountant, Robert Kaye (Kaye). Both Siegel and Kaye are longtime advisers to Big M. Siegel and Kaye initially met with Leon to discuss the advantages and disadvantages of the Shareholders' Agreements. Leon later met with Big M's other shareholders to discuss the agreements with them. None of the shareholders were personally represented by counsel during any discussion of the Shareholders' Agreements. The Shareholders' Agreements were approved by Big M's shareholders without meaningful negotiations. The shareholders merely adopted the recommendations of Siegel and Kaye, making no significant changes to the terms of either agreement. The First Agreement provided that *267 Big M and its shareholders "believe it is in their best interest to provide for continuity in the management and policies of * * * [Big M]." The First Agreement required the shareholders to elect the following individuals to the Board: Leon, Bernard, Laurence, Kenneth, Ken, and Alan. [9] The First Agreement required that vacancies in the Board be filed by the remaining board members, and that any new director must be an "issue" of a current shareholder or a spouse of a current shareholder. The First Agreement did not provide a price or a formula for determining the fair market value of transferred shares of Big M stock. The First Agreement, however, provided the following rules with respect to such a transfer: (1) The representative of an estate of a deceased shareholder could sell the decedent's stock to Big M, and Big M had to purchase the stock in accordance with the laws of the State of New Jersey pertaining to the purchase by a corporation of its own shares of stock. Big M was given the sole discretion to pay for the stock over any length of time (with interest at 10 percent) that Big M desired; (2) a shareholder could freely transfer Big M stock to his or her immediate family; *268 and (3) except as provided elsewhere in the First Agreement, a shareholder wanting to transfer Big M stock had to first offer the stock to Big M on the same terms and conditions as the proposed transfer. Big M had 90 days to decide whether it would purchase the stock. Big M had the sole discretion to pay for the stock over any length of time (with interest at 10 percent) that Big M desired. The Second Agreement provides that Big M's shareholders "desire to maintain ownership and control of * * * [Big M] among themselves and to provide for continuity in the management and ownership of * * * [Big M]", and "It is the desire of all of the parties to maintain, if at all possible, the same proportionate interest of each [family] Group in * * * [Big M]." Like the First Agreement, the Second Agreement requires the shareholders to elect the following individuals to the Board: Leon, Bernard, Laurence, Kenneth, Ken, and Alan. [10] The Second Agreement *269 requires that vacancies on the Board be filled by the remaining board members, and any new director must be a child of a current shareholder or a spouse of a current shareholder. The Second Agreement, which may be changed at any time by unanimous consent of Big M's shareholders, provides the following rules with respect to a transfer of Big M stock: (1) Each shareholder may freely transfer Big M stock to members of his or her family group; (2) if a shareholder wants to transfer Big M stock outside of his or her family group, the shareholder must first offer the stock to the members of his or her family group on the same terms and conditions on which the stock is offered to others. The members of the shareholder's family group have 90 days to exercise a right of first refusal. If the family members do not exercise such a right, Big M has 30 days to exercise the right of first refusal. Big M has the sole discretion to pay for the stock over any length of time (with interest at the prime rate) that Big M desires. If Big M does not exercise its right of first refusal, the shareholder may transfer the stock to an outsider. The shareholder must transfer all of his or her stock, and *270 the transferee must agree to be bound by the Second Agreement; and (3) upon the death of a shareholder, the representative of the estate may sell the decedent's stock to Big M, and it must purchase the stock in accordance with the laws of the State of New Jersey that pertain to the purchase by a corporation of its own stock. Big M has the sole discretion to pay for the stock over any length of time (with interest at the prime rate) that Big M desires. The price at which Big M will purchase the stock is determined solely by the holders of the voting stock. 5. Big M's Financial History
Relevant data from the consolidated financial statements of Big M and its subsidiaries are as follows: Taxable year ended
7/27/85
7/26/86 Current assets
$ 25,493,497 $ 30,530,663
Other assets
22,701,570 31,934,578
Total assets
48,195,067 62,465,241
Current liabilities
12,011,827 15,993,239
Other liabilities
1,850,755 7,550,747
Total liabilities
13,862,582 23,543,986
Stockholders' equity
34,332,485 38,921,255
Total liabilities and equity
48,195,067 62,465,241
Net sales
122,517,683 142,105,100
Other income
2,381,289 2,726,960
Total revenue
124,898,972 144,832,060
Costs and expenses
Cost of sales 72,211,079 82,833,851
Selling and administrative expense 39,067,790 48,343,988
Depreciation and amortization 1,997,689 3,278,966
Interest expense 154,566 258,270
Total expenses
113,431,124 134,715,075
Income before income taxes and
cumulative effect of a change in accounting principle 11,467,848 10,116,985
Provision for income taxes
5,628,000 5,480,000
Cumulative effect on prior years
of change in method of computing depreciation, net of income taxes (468,320)
-0-
Net Income
6,308,168 4,636,985
*271 Relevant data (in thousands) from the financial statements of Big M are as follows: Taxable year ended
7/25/87 1/30/88 7/30/88
Current assets
$ 47,723
$ 53,176
$ 62,088 Other assets
38,397
40,998
40,862 Total assets
86,120
94,174
102,950 Current liabilities
24,155
22,741
26,544 Other liabilities
15,802
12,712
12,320 Total liabilities
39,957
35,453
38,864 Stockholders' equity
46,163
58,721
64,086 Total liabilities & equity
86,120
94,174
102,950 Net sales
194,876
n/a
217,398 Other income
4,682
n/a
7,081 Total revenue
199,558
n/a
224,479 Costs and expenses
Cost of sales 114,133
n/a
129,244 Selling and administrative expense  65,535
n/a
76,654 Depreciation and amortization 4,604
n/a
5,281 Interest expense 682
n/a
1,169 Total expenses
184,954
n/a
212,348 Income before income taxes and
cumulative effect of a change in accounting principle 14,604
n/a
12,131 Provision for income taxes
7,314
n/a
848 Release of deferred Federal and
State income taxes -0-
n/a
(5,414)
Cumulative effect on prior
years (to July 25, 1987) of the change in inventory costing method -0-
n/a
(1,226)
Net income
7,290
n/a
17,923 *272 Taxable year ended
1/28/89
1/27/90
1/26/91
Current assets
$ 70,988
$ 72,283
$ 76,327
Other assets
43,089
47,448
48,331
Total assets
114,077
119,731
124,658
Current liabilities
30,484
37,381
50,985
Other liabilities
11,679
16,330
9,016
Total liabilities
42,163
47,711
60,001
Stockholders' equity
71,914
72,020
64,657
Total liabilities & equity
114,077
119,731
124,658
Net sales
227,057
251,602
264.100
Other income
8,472
9,214
8,803
Total revenue
235,529
260,816
270,903
Costs and expenses
Cost of sales 136,163
151,112
156.130
Selling and administrative expense  77,662
92,506
101,530
Depreciation and amortization 6,332
6,622
6,743
Interest expense 1,275
4,006
4,933
Total expenses
221,432
254,246
269,336
Income before income taxes and
cumulative effect of a change in accounting principle
14,097
6,570
1,567
Provision for income taxes
904
406
116
Release of deferred Federal and
State income taxes 0
0
0
Cumulative effect on prior
years (to July 25, 1987) of the change in inventory costing method 0
0
0
Net income
13,193
6,164
1,451
n/a -- Data not available
For its fiscal years that ended before 1983, Big *273 M generally paid annual dividends of $ 3.50 per share. Big M paid dividends of $ 28,350, $ 32,400, $ 36,450, $ 48,215, and $ 48,000 during its fiscal years ended in 1983, 1984, 1985, 1986, and 1987, respectively. In 1988 and 1989, Big M made distributions sufficient to cover its shareholders' tax liabilities. In 1990, Big M made distributions sufficient to cover its shareholders' tax liabilities, and it distributed approximately $ 52 per share to all of its shareholders in connection with the establishment of three grantor trusts. [11]
6. Federal Gift Tax Returns
a. Overview
*274 In 1976, Siegel and Kaye advised Leon, Max, and Bernard that they should establish a program under which they would give stock to their children. Each year thereafter, Siegel and Kaye advised Leon, Max, and Bernard as to the number of shares to give to their children. The following tables show the gifts of Leon, Max, and Bernard on each valuation date and list each shareholder's holding immediately after the gifts. [12]
December 31, 1986
Gifts
Holdings
Shares
of Stock
Class A
SHAREHOLDERS OF RECORDS: Received by Gift
%
Common %
Leon Mandelbaum
--
--
1,415
14.7
Kenneth A. Mandelbaum *
60
0.6
835
8.7
Beth Mandelbaum *
40
0.4
447
4.6
Joan Mandelbaum
30
0.3
437
4.5
Michael Mandelbaum *
30
0.3
437
4.5
Sub-Total          160
1.7
3,571
37.0
Max Mandelbaum
--
--
1,575
16.3
Laurence H. Mandelbaum *
50
0.5
825
8.6
Alan W. Mandelbaum *
50
0.5
825
8.6
Susan Mandelbaum *
25
0.3
346
3.6
Sub-Total          125
1.3
3,571
37.0
Bernard Mandelbaum
---
---
1,585
16.4
Ken Mandelbaum
40
0.4
648
6.7
Lee Elliot Mandelbaum
0
0.0
134
1.4
Gini Mandelbaum
0
0.0
134
1.4
Sub-Total          40
0.4
2,501
25.9
Total            325
3.4
9,643
100.0
*275 December 16, 1987
Gifts
Holdings
Shares
of Stock
Class A
SHAREHOLDERS OF RECORDS: Received by Gift
%
Common %
Leon Mandelbaum
--
--
1,200
12.4
Kenneth A. Mandelbaum *
80
0.8
915
9.5
Beth Mandelbaum *
55
0.6
502
5.2
Joan Mandelbaum
40
0.4
477
4.9
Michael Mandelbaum *
40
0.4
477
4.9
Sub-Total          215
2.2
3,571
37.0
Max Mandelbaum
--
--
1,375
14.3
Laurence H. Mandelbaum *
75
0.8
900
9.3
Alan W. Mandelbaum *
75
0.8
900
9.3
Susan Mandelbaum *
50
0.5
396
4.1
Sub-Total          200
2.1
3,571
37.0
Bernard Mandelbaum
---
---
1,510
15.7
Ken Mandelbaum
55
0.6
703
7.3
Lee Elliot Mandelbaum
10
0.1
144
1.5
Gini Mandelbaum
10
0.1
144
1.5
Sub-Total          75
0.8
2,501
25.9
Total            490
5.1
9,643
100.0
*276 December 23, 1988
Gifts
Holdings
Shares of
SHAREHOLDERS OF
Stock
Cla
Class B
ss A
SHAREHOLDERS OF
BY
Com-
Common
Total
RECORD: Gift mon
(Voting)
(Nonvoting)
Common
%
%
Leon Mandelbaum
--
--
1
1,134
1,135
11.8
Kenneth A.
25
0.3
1
939
940
9.7
Mandelbaum * Beth Mandelbaum * 16
0.2
0
518
518
5.4
Joan Mandelbaum *
12
0.1
0
489
489
5.1
Michael Mandelbaum *
12
0.1
0
489
489
5.1
Sub-Total          65
0.7
2
3,569
3,571
37.0
Max Mandelbaum
--
--
0
1,320
1,320
13.7
Laurence H.
21
0.2
1
920
921
9.6
Mandelbaum * Alan W. Mandelbaum * 21
0.2
1
920
921
9.6
Susan Mandelbaum *
13
0.1
0
409
409
4.2
Sub-Total          55
0.6
2
3,569
3,571
37.0
Bernard Mandelbaum
--
--
1
1,479
1,480
15.3
Ken Mandelbaum
20
0.2
1
722
723
7.5
Lee Elliot
5
0.1
0
149
149
1.5
Mandelbaum Gini Mandelbaum 5
0.1
0
149
149
1.5
Sub-Total          30
0.3
2
2,499
2,501
25.9
Total            150
1.6
6
9,637
9,643
100.0
*277 December 15, 1989
Gifts
Holdings
Shares of
SHAREHOLDERS OF
Stock
Received
Class A Class B
SHAREHOLDERS OF
BY
Com-
Common
Total
RECORD: Gift mon
(Voting)
(Nonvoting)
Common
%
%
Leon Mandelbaum
--
--
1
1,099
1,100
11.4
Kenneth A.
16
0.2
1
955
956
9.9
Mandelbaum * Beth Mandelbaum * 7
0.1
0
525
525
5.4
Joan Mandelbaum*
6
0.1
0
495
495
5.1
Michael Mandelbaum *
6
0.1
0
495
495
5.1
Sub-Total          35
0.4
2
3,569
3,571
37.0
Max Mandelbaum
--
--
0
1,295
1,295
13.4
Laurence H.
8
0.1
1
928
929
9.6
Mandelbaum * Alan W. Mandelbaum * 8
0.1
1
928
929
9.6
Susan Mandelbaum *
9
0.1
0
418
418
4.3
Sub-Total          25
0.3
2
3,569
3,571
37.0
Bernard Mandelbaum
--
--
1
1,467
1,468
15.2
Ken Mandelbaum
4
0.0
1
726
727
7.5
Lee Elliot
4
0.0
0
153
153
1.6
Mandelbaum Gini Mandelbaum 4
0.0
0
153
153
1.6
Sub-Total          12
0.1
2
2,499
2,501
25.9
Total            72
0.7
6
9,637
9,643
100.0
*278 February 1, 1990
Gifts
Holdings
Shares of
Stock
Received
Class A Class B
SHAREHOLDERS OF
BY
Comm
Common
Total
RECORD: Gift on %
(Voting)
(Nonvoting)
Common
%
Leon Mandelbaum
--
--
1
99
100
1.0
Kenneth A. Mandelbaum
0
0.0
1
955
956
9.9
Beth Mandelbaum
0
0.0
0
525
525
5.4
Joan Mandelbaum
0
0.0
0
495
495
5.1
Michael Mandelbaum
0
0.0
0
495
495
5.1
L. Mandelbaum Retained
1,000
10.4
0
1,000
1,000
10.4
Interest Trust Sub-Total          1,000
10.4
2
3,569
3,571
37.0
Max Mandelbaum
--
--
0
295
295
3.1
Laurence H. Mandelbaum
0
0.0
1
928
929
9.6
Alan W. Mandelbaum
0
0.0
1
928
929
9.6
Susan Mandelbaum
0
0.0
0
418
418
4.3
P. Mandelbaum Retained
1,000
10.4
0
1,000
1,000
10.4
Interest Trust * Sub-Total          1,000
10.4
2
3,569
3,571
37.0
Bernard Mandelbaum
--
--
1
467
468
4.9
Ken Mandelbaum
0
0.0
1
726
727
7.5
Lee Elliot Mandelbaum
0
0.0
0
153
153
1.6
Gini Mandelbaum 0
0.0
0
153
153
1.6
B. Mandelbaum Retained
1,000
10.4
0
1,000
1,000
10.4
Interest Trust Sub-Total          1,000
10.4
2
2,499
2,501
25.9
Total            3,000
31.3
6
9,637
9,643
100.0
*279 December 30, 1990
Gifts
Holdings
Shares of
SHAREHOLDERS OF
Stock
Received
Class A Class B
SHAREHOLDERS OF
BY
Com-
Common
Total
RECORD: Gift mon
(Voting)
(Nonvoting)
Common
%
%
Leon Mandelbaum
--
--
1
59
60
0.6
Kenneth A.
10
0.1
1
965
966
10.0
Mandelbaum * Beth Mandelbaum * 10
0.1
0
535
535
5.5
Joan Mandelbaum *
10
0.1
0
505
505
5.2
Michael Mandelbaum *
10
0.1
0
505
505
5.2
L. Mandelbaum Retained
1,000
10.4
0
1,000
1,000
10.4
Interest Trust Sub-Total          40
0.4
2
3,569
3,571
37.0
Max Mandelbaum
--
--
0
265
265
2.7
Laurence H.
10
0.1
1
938
939
9.7
Mandelbaum * Alan W. Mandelbaum * 10
0.1
1
938
939
9.7
Susan Mandelbaum *
10
0.1
0
428
428
4.4
P. Mandelbaum Retained
0
0.0
0
1,000
1,000
10.4
Interest Trust * Sub-Total          30
0.3
2
3,569
3,571
37.0
Bernard Mandelbaum
--
--
1
452
453
4.7
Ken Mandelbaum
5
0.1
1
731
732
7.6
Lee Elliot
5
0.1
0
158
158
1.6
Mandelbaum Gini Mandelbaum 5
0.1
0
158
158
1.6
B. Mandelbaum Retained
0
0.0
0
1,000
1,000
10.4
Interest Trust Sub-Total          15
0.2
2
2,499
2,501
25.9
Total            85
0.9
6
9,637
9,643
100.0
*280 b. Filing of Gift Tax Returns
Beginning in 1976 and for most years thereafter (including each of the years in issue), Bernard, Leon, and Max filed Federal gift tax returns and reported the transfer of Big M stock to their children and/or the grantor trusts. For the 1986 through 1989 calendar years, Beverly and Pearl each agreed to split the gifts with their husbands, see sec. 2513, and filed Federal gift tax returns. c. Preparation of Gift Tax Returns
Petitioners' 1976 through 1989 Federal gift tax returns were prepared by Siegel. Siegel and Kaye valued the shares of Big M for reporting on these returns. In valuing the shares, Siegel and Kaye first determined the total value of Big M stock by subtracting the net asset value of Big M's leasehold improvements from Big M's shareholders' equity. Siegel and Kaye then determined the per-share value of Big M by multiplying Big M's total value (as determined by them) by 50 percent *281 (to reflect a minority and marketability discount) and dividing the product by Big M's outstanding shares (9,643). Siegel and Kaye determined that each share of Big M stock was worth $ 1,469, $ 2,335, and $ 2,473 on the 1987, 1988, and 1989 valuation dates, respectively. Petitioners' 1990 Federal gift tax returns were prepared by the firm of Cole, Schotz, Bernstein, Meisel & Forman, P.A. (Cole, Schotz). Cole, Schotz valued the subject shares of Big M based on Big M's average income for the current and prior 4 years. Cole, Schotz first computed Big M's average income for these years, and then reduced the average amount by 50 percent in order to reflect a discount for minority interest and lack of marketability. Cole, Schotz determined that each share of Big M stock was worth $ 1,560 on both valuation dates in 1990. Cole, Schotz determined that the values of the gifts in trust made by Pearl, Leon, and Bernard were $ 504,638, $ 746,972, and $ 498,390, respectively. d. Respondent's Audits of Gift Tax Returns
Respondent conducted two separate audits with respect to petitioners' gifts of Big M stock. Siegel and Kaye represented petitioners during each audit. Respondent conducted *282 the first audit on the 1976, 1977, and 1978 Federal gift tax returns of Max, Pearl, Leon, and Beverly. Respondent conducted the second audit on the 1981 and 1982 Federal gift tax returns of Max, Pearl, Leon, Beverly, and Bernard. Leon, Max, Pearl, and Bernard consented to an additional gift tax assessment in connection with respondent's audit of 1982. 7. The Notices of Deficiency and Amendments to Answers
In her notices of deficiency, respondent determined that the values shown on petitioners' gift tax returns were incorrect. Respondent determined that the per-share values of Big M stock on the relevant valuation dates in 1987, 1988, and 1989 were $ 2,789, $ 5,129, and $ 8,020, respectively. Respondent determined that the per-share value of Big M stock on December 30, 1990, was $ 3,377, [13] and that the February 1, 1990, values of the gifts in trust by Pearl, Leon, and Bernard were $ 1,092,412, $ 1,617,006, and $ 1,078,887, respectively. Respondent also determined (and reflected in her notices of deficiency) additions to tax under section 6660 for valuation understatements for 1988, 1989, and 1990. *283 In her answers for the 1989 and 1990 years, respondent clarified that the additions to tax for valuation understatements for those years were asserted under section 6662(a) and (g). In October 1994, respondent amended her answers for the 1987 year to increase the deficiencies asserted against petitioners [14] and to assert that petitioners were liable for additions to tax under section 6660 for valuation understatements for that year. In March 1995, following the trial of these cases, respondent moved the Court for leave to amend her answers to the 1990 petitions of Pearl, Leon, and Bernard, to conform her pleadings to the proof. We granted respondent's motion shortly thereafter. Respondent currently alleges that the per-share values of Big M stock were $ 5,127 and $ 3,077 on February 1, 1990, and December 30, 1990, respectively; i.e., the freely traded values of Big M stock, as stipulated to by the parties, *284 less a 30-percent marketability discount. Respondent also currently alleges that Pearl, Leon, and Bernard are liable for additions to their 1990 gift taxes under section 6662(a) and (g). OPINION Issue 1. Marketability Discount
a. Overview
The parties have stipulated the fair market values of the subject shares of Big M stock on the relevant valuation dates, but their stipulated values do not include any discount for lack of marketability. After a trial during which each side introduced expert testimony on the subject of a proper discount, we are asked to determine the correct allowance for the subject shares' lack of marketability. The record is replete with charts, graphs, factual data, testimony, and expert opinion. We must evaluate all of the evidence and render a judgment. We are not bound by precise appraisal formulas. As the Court has previously observed, the valuation of property is an inexact science, and, if not settled by the parties, must be resolved by the judiciary by way of "Solomon-like" pronouncements. Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980); Messing v. Commissioner, 48 T.C. 502, 512 (1967). *285 As typically occurs in a case of valuation, the parties primarily rely on their experts' testimony and reports to support the parties' contrary positions on the valuation issue. Expert testimony sometimes aids the Court in determining valuation. Other times, it does not. [15]The Court is not bound by an opinion of an expert. We weigh an expert's testimony in light of his or her qualifications, as well as with regard to all other credible evidence in the record. Depending on what we believe is appropriate under the facts and circumstances of the case, we may reject an expert's opinion in its entirety, accept it in its entirety, or accept only selective portions of it. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 186 (1994); Parker v. Commissioner, 86 T.C. 547, 562 (1986); see also Estate of Levenson v. Commissioner, 282 F.2d 581, 582 (3d Cir. 1960), remanding T.C. Memo. 1959-120. *286 Petitioners must prove that respondent's determinations of value set forth in her notices of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); Estate of Gilford v. Commissioner, 88 T.C. 38, 51 (1987). Respondent bears the burden of proving the increases in the deficiency (including additions thereto) asserted in her amended answers.[16]Rule 142(a); Estate of Bowers v. Commissioner, 94 T.C. 582, 595 (1990). Valuation is a question of fact, and the trier of fact must weigh all relevant evidence to draw the appropriate inferences. Commissioner v. Scottish Am. Inv. Co., 323 U.S. 119, 123-125 (1944); Helvering v. National Grocery Co., supra at 294; Publicker v. Commissioner, 206 F.2d 250, 252 (3d Cir. 1953), affg. a Memorandum Opinion of this Court; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990); Skripak v. Commissioner, 84 T.C. 285, 320 (1985); see also Rev. Rul. 59-60, 1959-1 C.B. 237. *287 *288 For Federal gift tax purposes, the fair market value of the subject property is determined as of the date of each gift, and, ordinarily, no consideration is given to any unforeseeable future event that may have affected the value of the property. Sec. 2512(a); sec. 20.2031-1(b), Estate Tax Regs.; see also First Natl. Bank v. United States, 763 F.2d 891, 893-894 (7th Cir. 1985); Estate of Newhouse v. Commissioner, supra at 218; Estate of Gilford v. Commissioner, supra at 52-53. Fair market value is defined for both estate tax and gift tax purposes to mean the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all the relevant facts and neither person being under a compulsion to buy or to sell. Sec. 20.2031-1(b), Estate Tax Regs.; see also United States v. Cartwright, 411 U.S. 546, 551 (1973); Dorn v. United States, 828 F.2d 177, 180 (3d Cir. 1987); Snyder v. Commissioner, 93 T.C. 529, 539 (1989); Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989). *289 The willing buyer and the willing seller are hypothetical persons, rather than specific individuals or entities, and the individual characteristics of these hypothetical persons are not necessarily the same as the individual characteristics of the actual seller or the actual buyer. First Natl. Bank v. United States, supra at 893-894; Estate of Curry v. United States, 706 F.2d 1424, 1428-1429, 1431 (7th Cir. 1983); Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981); Estate of Newhouse v. Commissioner, supra at 218. Special rules govern the valuation of corporate stock. When stock is listed on an established securities market, the stock's value usually equals its listed market price. When stock is not listed on such a market, the stock's value may be based on the unlisted stock's recent arm's-length sales. Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982); Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 276 (1979). In the absence of recent sales, the *290 value of unlisted stock is determined by taking into consideration the value of the corporation's listed stock, or, if the corporation has no listed stock, the listed stock of corporations engaged in the same or a similar line of business. Sec. 2031(b); Estate of Hall v. Commissioner, supra at 336. Unlisted stock must also be valued indirectly by reference to the subject corporation's net worth, its prospective earning power, its dividend-earning capacity, its goodwill, its management, its position in the industry, the economic outlook for its industry, the degree of control represented by the block of its stock to be valued, and the amount and type of its nonoperating assets if not considered elsewhere. See Estate of Hall v. Commissioner, supra at 336; Estate of Andrews v. Commissioner, supra at 940; sec. 20.2031-2(f), Estate Tax Regs. When determining the value of unlisted stock by reference to listed stock, a discount from the listed price is typically warranted in order to reflect the unlisted stock's lack of marketability. Such a discount, commonly known as a "lack of *291 marketability discount" (or, more succinctly, a "marketability discount"), reflects the absence of a recognized market for closely held stock and accounts for the fact that closely held stock is generally not readily transferable. A marketability discount also reflects the fact that a buyer may have to incur a subsequent expense to register the unlisted stock for public sale. See Estate of Trenchard v. Commissioner, T.C. Memo. 1995-121; Rev. Rul. 77-287, 1977-2 C.B. 319, 320-321. The parties have stipulated the "freely traded" values of Big M's class B common stock on the pertinent valuations dates. These stipulated values take into account any applicable minority discount. The stipulated values must be discounted to reflect the fact that Big M's stock is unlisted and is not easily marketable. Ascertaining the appropriate discount for limited marketability is a factual determination. Critical to this determination is an appreciation of the fundamental elements of value that are used by an investor in making his or her investment decision. A nonexclusive list of these factors includes: (1) The value of *292 the subject corporation's privately traded securities vis-a-vis its publicly traded securities (or, if the subject corporation does not have stock that is traded both publicly and privately, the cost of a similar corporation's public and private stock); (2) an analysis of the subject corporation's financial statements; (3) the corporation's dividend-paying capacity, its history of paying dividends, and the amount of its prior dividends; (4) the nature of the corporation, its history, its position in the industry, and its economic outlook; (5) the corporation's management; (6) the degree of control transferred with the block of stock to be valued; (7) any restriction on the transferability of the corporation's stock; (8) the period of time for which an investor must hold the subject stock to realize a sufficient profit; (9) the corporation's redemption policy; and (10) the cost of effectuating a public offering of the stock to be valued, e.g., legal, accounting, and underwriting fees. See Estate of Gilford v. Commissioner, 88 T.C. 38, 60 (1987); Northern Trust Co. v. Commissioner, 87 T.C. 349, 383-389 (1986); see also Rev. Rul. 77-287, 1977-2 C.B. 319 *293 (valuation of restricted securities). b. Respondent's Determination and Her Expert
Respondent determined that the freely traded value of Big M stock must be discounted by 30 percent to reflect its lack of marketability on the six valuation dates. Respondent supports her determination with the testimony of her expert, Paul R. Mallarkey (Mallarkey). Mallarkey is the Northeast regional valuation director for Valuation and Appraisal Services at BDO, Seidman, a major international accounting firm. Mallarkey is also a senior member and accredited senior appraiser in business valuation with the American Society of Appraisers, and a chartered financial analyst with the Institute of Chartered Financial Analysts. Mallarkey used three studies on the sale of "restricted stock" [17] *295 to ascertain the marketability discount for the subject shares. [18] The first study, Securities and Exchange Commn., Institutional Investor Study Report, H.R. Doc. 92-64 (Vol. 5), 92d Cong., 1st Sess. (1971), is based on more than 300 private transactions of the restricted stock of corporations that had shares of the same class of stock which were publicly traded. The study finds that the median discount *294 for restricted stock of over-the-counter nonreporting companies is between 30.1 and 40 percent. [19] The second study, Moroney, "Most Courts Overvalue Closely Held Stocks", 51 Taxes 144 (1973), is based on 10 registered investment companies that held a total of 146 blocks of restricted equity securities. The study finds that the companies' original cash-purchase discounts averaged 36 percent, in comparison to the prices of securities of the same issuers which were not restricted. The third study, Maher, "Discounts for Lack of Marketability for Closely Held Business Interests", 54 Taxes 562 (1976), is based on reports filed with the Securities and Exchange Commission by four mutual companies for their 1969 through 1973 years, with respect to restricted common stock purchased by them. The study finds that the stocks' mean discount are 34.73 percent. Discounts in the third study were derived by comparing the funds' costs for the stock to market values of unrestricted securities of the same classes of stock in the same companies on the same acquisition days. Given the fact that these three restricted stock studies find that restricted stock generally sells at a 30- to 35-percent discount from unrestricted stock, Mallarkey concluded that a 30-percent discount is appropriate for all six valuation dates. Mallarkey found that the risk associated with holding Big M stock is neutralized by its size and stable gross profits, which have allowed Big M to remain profitable. Mallarkey also found that the Shareholders' Agreements do not seriously affect the marketability of Big M stock. c. Petitioners' Position and Their Expert
Petitioners contend that a 75-percent marketability discount applies to 1986 through 1989, and a 70-percent discount applies for 1990. Petitioners support their 70- and 75-percent rates with the testimony of *296 their expert, Roger J. Grabowski (Grabowski). Grabowski is a principal and the national director of Valuation Services Group at Price Waterhouse, LLP. Grabowski valued the subject shares and calculated the following range of marketability discounts for the shares: Date
Discount Range
1986
66-94%
1987
63-93
1988
69-95
1989
73-96
Feb. 1990
68-83
Dec. 1990
64-78
Grabowski opined that a 75-percent discount applies for 1986 through 1989 and a 70-percent discount applies for 1990. In reaching his opinion, Grabowski concluded that Big M stock is "virtually illiquid" and assumed that an investor in Big M would have to wait 10 to 20 years for his or her investment to become liquid. Grabowski based his conclusions primarily on the fact that Big M's shareholders executed the Shareholders' Agreements. [20] Grabowski also based his conclusions on the facts that: (1) Members of the Mandelbaum family have always owned Big M, (2) the family has no plans to make Big M public or to seek outside investors, (3) Big M's senior management is relatively young and approximately 20 years from normal retirement age; and (4) none of the gifts in issue significantly changed the voting *297 power of Big M. Grabowski further based his conclusions on his allegations that Big M had an erratic dividend history, and that any investor in Big M would be uncertain as to whether he or she would receive regular dividends. Grabowski analyzed the same three restricted stock studies analyzed by Mallarkey. Grabowski *298 also analyzed four other restricted stock studies and three studies on initial public offerings (IPO). The four other restricted stock studies were: Gelman, An Economist-Financial Analysts Approach 353 (1972) (average discount on restricted stock purchased by four closed-end investment companies that specialized in restricted stock); Trout, "Estimation of the Discount Associated with the Transfer of Restricted Securities", 55 Taxes 381 (1977) (average discount on restricted stock purchased by mutual funds from 1968 to 1972); Pittock & Stryker, "Revenue Ruling 77-287 Revisited", SRC Quarterly Reports 1 (Spring 1983); and Willamette Management Associates Study, as described in Pratt, Valuing a Business 247 (2d ed. 1989) (median discount for 33 arm's-length private placements of restricted stock, as compared to their freely traded counterparts, from January 1, 1981, through May 31, 1984). These four studies, taken together with the other three studies, generally find a 35-percent marketability discount for transfers of restricted stock. Grabowski also analyzed IPO studies. [21]IPO studies report the differences between the sale prices of stocks in IPO's and the sale prices of the *299 same stocks in private sales occurring shortly before the public transactions. The three IPO studies analyzed by Grabowski were: Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock -- January 1980 through June 1981", Business Valuation News 21 (Sept. 1985); Emory, "The Value of Marketability as Illustrated in Initial Public Offerings of Common Stock -- January 1985 through June 1986", Business Valuation Reviews 12 (Dec. 1986); and Willamette Management Associates Studies, as described in Pratt, supra at 250. These IPO studies find average marketability discounts of 45 percent. Grabowski concluded that the marketability discount for the subject shares is higher than the discounts in the restricted stock and IPO studies because Big M stock is illiquid. Grabowski interviewed a number of investment firms to ascertain the rate of return that they would require from an investment in a company similar *300 to Big M stock. These investors generally reported returns ranging from 25 to 40 percent. Grabowski concluded that an investor's required rate of return for an investment in Big M would be 35 to 40 percent. Grabowski assumed that such an investor would have to hold his or her stock for 10 to 20 years. Grabowski calculated his range of discounts based on his assumed holding period of 10 to 20 years and his ascertained required rate of return of 35 to 40 percent. Grabowski's calculations for 1990 reflect the fact that Big M made larger distributions during that year than in prior years. d. Court's View on Experts
We are unpersuaded by Mallarkey's analysis and conclusions. Given the fact that the record adequately shows that the Mandelbaum family plans to keep Big M family controlled and privately held, we do not believe that Mallarkey gave enough weight to the fact that a person outside of the Mandelbaum family would acquire no meaningful powers in Big M if he or she invested in the company. We also find that Mallarkey did not give enough weight to the transferability restrictions embodied in the Shareholders' Agreements. Although we conclude below that these restrictions *301 are not determinative with respect to the valuation issue, we believe that the Shareholders' Agreements create a chilling effect on prospective investors, and, accordingly, that some consideration must be given to the agreements' effect on the issue of marketability. Spitzer v. Commissioner, 153 F.2d 967 (8th Cir. 1946), affg. a Memorandum Opinion of this Court; Estate of Hall v. Commissioner, 92 T.C. 312, 325 (1989); Harwood v. Commissioner, 82 T.C. 239, 260, 263-264 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). We are further troubled by the fact that Mallarkey relied primarily (if not entirely) on the restricted stock studies to support his conclusion of a 30-percent discount rate. Because the restricted stock studies analyzed only "restricted stock", the holding period of the securities studied was approximately 2 years. Mallarkey has not supported such a short holding period for Big M stock, and we find no persuasive evidence in the record to otherwise support it. [22] In addition, the restricted stock studies analyzed only the restricted *302 stock of publicly traded corporations. Big M is not a publicly traded corporation. We are no more persuaded by Grabowski's analysis or conclusions. First, Grabowski's determination of fair market value focuses only on a hypothetical willing buyer and does not reflect the view of a hypothetical willing seller. Although the record indicates that petitioners adamantly desire to keep the ownership of Big M within their family, the test of fair market value rests on the concept of a hypothetical willing buyer and a hypothetical willing seller. Ignoring the views of a willing seller is contrary to this well-established test. In this regard, Grabowski failed to consider any person who could be considered a hypothetical willing seller of Big M stock. He also did not consider whether such a seller would sell his or her Big M stock for at least 70 percent less than its freely traded value. *303 We find incredible the proposition that any shareholder of Big M would be willing to sell his or her stock at such a large discount. Second, we give the Shareholders' Agreements less weight than Grabowski. According to Grabowski, the right of first refusal contained in the Shareholders' Agreements "severely restricts" marketability of Big M stock. Grabowski, however, has not persuaded us that his assertion is true, let alone that the right results are 70- and 75-percent marketability discounts. We find Grabowski's heavy reliance on the Shareholders' Agreements especially troublesome, given the fact that the agreements specify no price or formula (such as book value per share) at which the shares must be offered to Big M or to its other shareholders. In most cases, especially where an operating company is concerned, a right of first refusal without a fixed price has little, if any, effect on fair market value (which inherently includes any marketability discount), see, e.g., Couzens v. Commissioner, 11 B.T.A. 1040, 1164 (1928), and such an absence of a fixed price clearly has a less dramatic effect than fixed-price restrictions, see e.g., Worcester County Trust Co. v. Commissioner, 134 F.2d 578, 581-582 (1st Cir. 1943), *304 revg. Estate of Smith v. Commissioner, 46 B.T.A. 337 (1942); Estate of Reynolds v. Commissioner, 55 T.C. 172, 188-190 (1970). Indeed, a right of first refusal without a fixed price does not limit the buyers to whom a seller could sell his or her stock, or the price for that stock, but merely governs the order in which prospective buyers must stand in line to buy the stock. Couzens v. Commissioner, supra at 1163-1164. Given the fact that the right actually protects and benefits the other shareholders, who are given the first right to purchase the shares that a fellow shareholder desires to sell, the depressant effect (if any) on the value of privately held stock subject to a right of first refusal is not necessarily substantial. Third, we are troubled by the fact that Grabowski failed to consider hypothetical willing buyers who are genuine representatives of prospective investors in Big M. Although Grabowski conducted interviews with nine investors, Grabowski's interviewees included only leveraged buyout groups, merchant bankers, and venture capitalists. Such a group of investors may (and did) require a higher *305 rate of return than other investors. Grabowski should have included in his test a more representative sample of willing buyers of Big M stock, e.g., competitors of Big M or independent investors. Grabowski did not do so. We find that Grabowski's failure to do so weakens his testimony. [23] See Estate of Salsbury v. Commissioner, T.C. Memo. 1975-333. Fourth, we have problems with *306 many of the assumptions that Grabowski relied on to determine the marketability discount. Grabowski relied on his interviews for the proposition that a willing buyer of Big M stock must receive a 35- to 40-percent annual rate of return for his or her investment. As mentioned above, we find this reliance misplaced. Grabowski also relied on his assumption that a buyer would have to hold Big M stock for 10 to 20 years in order to make his or her investment worthwhile. We find this reliance equally misplaced. Although Grabowski mentioned retirement for the current generation in the same breath as his 10-to 20-year assumption, Grabowski fails to explain how the current generation's retirement will add to the marketability of Big M stock. Grabowski also mentioned petitioners' intent to keep the stock family owned. The record, however, does not support Grabowski's assumption that petitioners will surrender family control in 10 to 20 years. e. Court's Determination of Marketability Discount
Having found limited refuge in the opinions of either expert, we proceed to determine the value of the marketability discount. We do so by analyzing the above mentioned factors as of the *307 following valuation dates: December 31, 1986, December 16, 1987, December 23, 1988, December 15, 1989, February 1, 1990, and December 30, 1990. [24]
1. Private Versus Public Sales of the Stock
To determine a marketability discount for unlisted stock, sales of similar interests in like companies are frequently considered. Numerous studies have been made with respect to this factor. We find that the 10 studies analyzed by Grabowski are more encompassing than the three studies analyzed by Mallarkey. Because Grabowski's studies found that the average marketability discount for a public corporation's transfer of restricted stock is 35 percent, and that the average discount for IPO's is 45 percent, we use these figures as benchmarks of the marketability discount for the shares at hand. 2. Financial Statement Analysis
Investors normally *308 regard the analysis of a company's financial statements as a significant factor for determining the worth of the company's stock. Financial statements include the annual results of a company's operations (an income statement) and the company's status at its yearend (a balance sheet). Financial statements also include relevant footnotes relating to the statements, and the opinion of the preparer, e.g., an independent certified public accountant (C.P.A.), as to the condition of the company and the presentation of its financial statements. A nonexclusive list of relevant inquiries to make when analyzing financial statements includes the type of opinion rendered by the preparer; the soundness of the company's capitalization; the ratio of the company's assets to liabilities; the company's net worth and future earning power; the quality of the company's revenue and earnings; and the company's goodwill. Turning to the facts at hand, we find that Big M engaged independent C.P.A.'s to perform certified audits on, and gave unqualified opinions with respect to, Big M's financial position on (and for the taxable years ended) January 26, 1991; January 27, 1990; January 28, 1989; July 30, 1988; *309 and July 25, 1987. Big M's independent C.P.A.'s also performed certified audits on, and gave unqualified opinions with respect to, Big M and its subsidiaries' financial position on (and for the taxable years ended) July 26, 1986, and July 27, 1985. Big M had strong capitalization on the six valuation dates. It also had solid current ratios of assets to liabilities. Accordingly, Big M was able to finance its operations to the extent necessary. Big M's net worth, revenue, and earnings also were substantial for the subject years: For example, the net sales of Big M and its subsidiaries increased approximately 16 percent from their taxable year that ended in 1985 to their taxable year that ended in 1986; Big M's net sales continually increased for each of its taxable years ended in 1987 to 1991; Big M's net sales increased by 35.5 percent from its taxable year that ended in 1987 to its taxable year that ended in 1991; the net income for Big M and its subsidiaries exceeded $ 4.6 million for their taxable years ending in 1985 and 1986; Big M's net income exceeded $ 6.1 million for all of its taxable years that ended in 1987 through 1990; and Big M's net income exceeded $ 1.4 million *310 for its taxable year that ended in 1991. We also find relevant the fact that Big M paid $ 5,719,000 in cash to purchase 30 retail stores of a competitor in 1986. The presence of cash is important in an apparel business, and Big M had sufficient cash during each of the subject years. Given the additional fact that Big M's stores are widely recognized in the industry, we conclude that these factors favor a below-average marketability discount for stock in Big M on each of the six valuation dates. 3. Company's Dividend Policy
Investors regard a company's dividend policy as a factor to consider in determining the worth of that company's stock. Critical to this factor is whether an investor will receive a fair rate of return on his or her investment. The fact that a company pays small or no dividends will not always negatively affect the company's marketability. Northern Trust Co. v. Commissioner, 87 T.C. 349, 388-389 (1986). Even if a corporation seldom pays dividends, an investor may aim to participate in the corporation's success mainly through the appreciation in the value of his or her stock brought on by retained earnings and the possibility *311 of a future return. Turning to the facts at hand, Big M has paid small dividends in comparison to its net income. We do not find this fact determinative. Big M's net income exceeded $ 6.1 million for each of its years ended in 1987 through 1990, and its net income exceeded $ 1.4 million for its year ended in 1991. Big M also had sufficient cash during each of those years. Accordingly, the Big M stock might attract an investor more interested in long-term growth than in current return. This factor favors a below-average marketability discount. 4. Nature of the Company, Its History, Its Position in the Industry, and Its Economic Outlook
Investors generally regard the nature of a company, its history, its position in the industry, and its economic outlook as relevant factors for determining the worth of the company's stock. In the instant case, Big M was not the leader in its industry. Its operations, however, were diversified and very profitable as of all six valuation dates. The future of Big M looked bright on each of these dates. This factor favors a below-average marketability discount. 5. Company's Management
Investors regard the strength of a company's *312 management as a factor to consider when determining the worth of that company's stock. Id. at 388-389. In the instant case, Big M has a proven and experienced management team that is well known in the industry. Based on its track record, an investor would have reason for confidence in Big M's management team. Big M's policy decisions have furthered the business of the company as a whole, rather than promoting the interests of only the shareholders belonging to a particular branch of the family. This factor favors a below-average marketability discount. 6. Amount of Control in Transferred Shares
Investors regard the control inherent in transferred shares as a relevant factor for determining the worth of the stock. Control reflects a shareholder's ability to direct a corporation through his or her dictation of its policies, procedures, or operations. Control of a closely held corporation represents an element of value that justifies a higher value for a controlling block of stock. An investor will pay more for a block of stock that represents control than for a block of stock that is merely a minority interest in the company. Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1588-1589 (1987). *313 None of the blocks of stock that are at issue herein represent control of Big M. This factor favors an average marketability discount. 7. Restrictions on Transferability of Stock
Investors consider transferability restrictions as a factor to consider in determining the worth of that company's stock. Harwood v. Commissioner, 82 T.C. 239, 260, 263-264 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986). In the instant case, we do not regard the Shareholder Agreements as a major factor because they specify no price (or formula to determine a price) for the right of first refusal. We are mindful that the agreements are enforceable legal documents. All the same, the Shareholders' Agreements, on their face, serve the legitimate business purpose of preserving family ownership and control of Big M. Nevertheless, we are not persuaded that the restrictions embodied therein result in severe restrictability on the transfer of Big M's shares or in a large marketability discount. This factor favors an above-average to average marketability discount. 8. Holding Period for Stock
The length of time that *314 an investor must hold his or her investment is a factor to consider in determining the worth of a corporation's stock. An interest is less marketable if an investor must hold it for an extended period of time in order to reap a sufficient profit. Market risk tends to increase (and marketability tends to decrease) as the holding period gets longer. Grabowski assumed that an investor in Big M stock must hold his or her stock for 10 to 20 years. Mallarkey assumed a shorter period of 2 years. We are unpersuaded by either assumption. We consider this factor to be neutral. 9. Company's Redemption Policy
A company's redemption policy is a factor to consider in determining the worth of the company's stock. Turning to the facts at hand, the record does not disclose whether Big M has a set redemption policy. We know, however, that Big M redeemed its shares on at least one occasion. In or about 1974, Big M redeemed 900 of its shares from Bernard for $ 400,000 in cash. Big M did so because Bernard needed the money to settle a divorce from his former spouse. We also know that the Shareholders' Agreements give Big M the right to purchase its shares before a buyer outside of the *315 Mandelbaum family may do so and do not set a price for these shares. Given that Big M has previously redeemed shares for the sole benefit of one of its shareholders, we find nothing that would prevent it from later redeeming the shares of a seller at their freely traded value (or greater) in order for Big M to remain family owned. We believe that a hypothetical buyer or seller would consider Big M's prior redemption in a favorable light when viewing the price that he or she would assign to the shares. This factor favors a below-average marketability discount. 10. Costs Associated With Making a Public Offering
Investors consider the costs associated with making a public offering in determining the value of unlisted stock. An above-average to average discount is warranted if the buyer completely bears the cost of registering the purchased stock. The discount is lessened, however, to the extent that the buyer has the ability to minimize his or her registration costs. Registration costs may be minimal to the buyer, for example, if he or she has the right to compel the corporation to register (or otherwise "piggyback") the unlisted shares at its expense. This factor favors *316 an above-average to average marketability discount. 11. Conclusion
Based on the record as a whole, and on our evaluation of the above-mentioned factors, we conclude that the marketability discount for the subject shares on each of the valuation dates is no greater than the 30 percent allowed by respondent. We hold that a 30-percent marketability discount is to be applied to determine the fair market values of Big M shares on the relevant dates. Issue 2. Valuation Understatement Penalties
a. Overview
Respondent determined that petitioners are liable for additions to their 1987 through 1990 Federal gift taxes for valuation understatements. Petitioners alternatively argue that they are not liable for these additions because: (1) The subject stock either was not undervalued or was not undervalued by the statutory thresholds; (2) they used acceptable valuation methods; or (3) they justifiably relied upon professionals to value the subject shares. b. Section 6660
With respect to petitioners' 1987 and 1988 taxable years, section 6660(a) imposes additions to gift tax in the case of an underpayment of gift tax that is attributable to a valuation understatement. *317 A valuation understatement occurs if the value of any property claimed on the taxpayer's Federal gift tax return is 66-2/3 percent or less of the amount determined to be the correct value. Sec. 6660(c). The additions range from 10 to 30 percent, depending on the amount of the understatement. Sec. 6660(b). Respondent may waive all or part of the addition if the taxpayer shows that: (1) He or she had a reasonable basis for the valuation reported on the return and (2) the value was reported in good faith. Sec. 6660(e). Respondent's refusal to grant such a waiver is reviewable by the Court under an abuse of discretion standard. Estate of Jung v. Commissioner, 101 T.C. 412, 449 (1993); Mailman v. Commissioner, 91 T.C. 1079, 1082-1084 (1988). Petitioners must prove that they are not liable for the additions to their 1988 Federal gift taxes or that respondent abused her discretion in not waiving these additions. Respondent must prove that petitioners are liable for the additions to their 1987 taxes; she raised these additions in her amendments to her answers. Respondent may prove that petitioners: (1) Did not have a *318 reasonable basis for the valuations claimed on their returns or (2) did not report the valuations in good faith. Failing that, respondent must prove that her refusal to waive these additions: (1) Was not arbitrary; (2) was not capricious, and (3) had a sound basis in fact. Estate of Jung v. Commissioner, supra at 450; Mailman v. Commissioner, supra at 1084. Based on the record as a whole, we find that petitioners had a reasonable basis for the values claimed on their 1987 and 1988 gift tax returns and that they reported the value in good faith. We also find that respondent abused her discretion with respect to these years. [25] Respondent primarily argues in her brief that the additions are appropriate because petitioners unreasonably relied on the valuations of Siegel and Kaye. Respondent states that petitioners should have known that their professionals' valuations were unreasonable based on the prior audits and the results thereof. To this proposition, we cannot agree. The mere fact that respondent challenged petitioners' valuation method in prior years does not mean that the method was unreasonable. *319 Indeed, the written agreements signed by petitioners in connection with respondent's audits neither bound the parties thereto in future years nor constituted an acknowledgment that respondent was correct. See Consolidated Freightways, Inc. v. United States, 223 Ct. Cl. 443, 620 F.2d 862, 867-868 (1980). Accordingly, we find that respondent's failure to waive the additions for 1987 and 1988 was an abuse of her discretion. In so doing, we stress the fact that petitioners reasonably relied on the apparent expertise of Siegel, as displayed to them by his manner, education, and legal experience, and petitioners reasonably reported Siegel's valuation to respondent in good faith. c. Section 6662(a) and (g)
For gift tax returns due after December 31, 1989, e.g., petitioners' 1989 and 1990 returns, a penalty under section 6662(a) and (g) applies *320 to any underpayment of gift tax that is attributable to a valuation understatement. A valuation understatement occurs if the value of property claimed on the return is 50 percent or less of the amount determined to be its correct value, and the portion of the underpayment attributable to the substantial gift tax understatement exceeds $ 1,000. Sec. 6662(g). The penalty equals 20 percent of the portion of the underpayment attributable to the understatement. Sec. 6662(a). The penalty does not apply to any portion of the underpayment for which the taxpayer shows that he or she: (1) Had reasonable cause and (2) acted in good faith with respect thereto. Sec. 6664(c); see also United States v. Boyle, 469 U.S. 241, 242 (1985). Whether a taxpayer had reasonable cause and acted with good faith is a factual determination. Sec. 1.6664-4(b), Income Tax Regs. Critical to this test is whether the taxpayer used ordinary business care and prudence in attempting to assess his or her proper tax liability. Ordinary business care and prudence may be present if the taxpayer had an honest misunderstanding of fact or law that is reasonable in light of his or her *321 experience, knowledge, and education. Ordinary business care and prudence may also be present if the taxpayer reasonably relied on competent professional advice. Such is the case, even if the professional's advice proved to be erroneous. Sec. 1.6664-4(b)(1), Income Tax Regs.; see also United States v. Boyle, supra at 242, 251. The record shows that petitioners made a reasonable attempt to assess their proper tax liability with respect to the gifts at issue. Because petitioners lacked sophistication in valuation and tax matters, they retained Siegel and Kaye to value the subject shares. Petitioners reasonably relied on the judgment and advice of their two longtime, professional advisers. Under the facts herein, petitioners were not required to second-guess their professionals' advice. Respondent mainly argues that petitioners' reliance was unreasonable because her prior audits put them on notice that she disagreed with their valuation method. For the same reasons as mentioned above, we disagree. We hold for petitioners on this issue. We have considered all arguments made by the parties and, to the extent not discussed above, find them to *322 be without merit. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Leon Mandelbaum, docket Nos. 20678-92, 12758-94, 12759-94, 12760-94; Beverly Mandelbaum, docket Nos. 20689-92, 12761-94, 12762-94, 12763-94; Bernard Mandelbaum, docket Nos. 12749-94, 12750-94, 12751-94; Max Mandelbaum, docket Nos. 20687-92; 12752-94, 12753-94, 12754-94; Pearl Mandelbaum, docket Nos. 20688-92, 12755-94; 12756-94, 12757-94.↩
2. Respondent audited petitioners' 1986 Federal gift tax returns and increased the amounts of their taxable gifts that were exempted from gift tax by application of the unified credit for that year. The increase, in turn, decreased the unified credits available to petitioners with respect to taxable gifts made in years after 1986. Petitioners' 1986 taxable year is before the Court solely to determine their unified credits.↩
3. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Petitioners alleged in their petitions that respondent mailed her notices of deficiency to them after the statutory period of limitations for assessment and collection of gift tax. Respondent's pleadings contain denials of this allegation, and set forth affirmative facts to support her denials. Because petitioners did not raise this issue at trial or in their briefs, we hold that their silence amounts to a concession of this issue. Burbage v. Commissioner, 82 T.C. 546, 547 n.2 (1984), affd. 774 F.2d 644↩ (4th Cir. 1985). We note, however, that the record indicates that respondent issued the subject notices of deficiency to petitioners before the expiration of the period of limitations.
5. Accordingly, each branch of the family had two voting shares.↩
6. Mandee Shops does business in certain States under the name "Karin Morgan".↩
7. The parties have stipulated these freely traded values. These values take into account any minority interest discount that is applicable.↩
8. Siegel is also a certified public accountant.↩
9. Or, in other words, two persons from each branch of the Mandelbaum family.↩
10. Or, in other words, two persons from each branch of the Mandelbaum family.↩
11. The three trusts -- the Bernard Mandelbaum Retained Interest Trust, the Leon Mandelbaum Retained Interest Trust, and the Pearl Mandelbaum Retained Interest Trust -- were each established on Feb. 1, 1990, and were irrevocable. Under their terms, each grantor could receive all of the income from the transferred property for a set period of time (e.g., 10 years), and the remainder interest would pass to his or her children equally.↩
12. We note that the percentages of the shareholders' holdings contain rounding errors of .01.↩
*. Note -One-half of these gifts was considered made by the donor's spouse.↩
*. Note - One-half of these gifts was considered made by the donor's spouse.↩
*. Note - One-half of these gifts was considered made by the donor's spouse.↩
*. Note - One-half of these gifts was considered made by the donor's spouse.↩
*. Note - Max gave these shares to Pearl, who, in turn, gave them to this trust.↩
*. Note - One-half of these gifts was considered made by the donor's spouse.↩
13. Contrary to her determination with respect to Leon, Pearl, Beverly, and Bernard, respondent determined the value of Max's gift on Dec. 30, 1990, by reference to a per-share value of $ 3,777. The record does not support a different value for Max, as opposed to the other four petitioners, and we assume that respondent's reference to the higher per-share value in Max's notice of deficiency was an error.↩
14. Respondent asserted in her amendments that the per-share value on the 1987 valuation date was $ 4,784.↩
15. For example, expert testimony is not useful to the Court when the expert is merely an advocate for the position argued by the party. Laureys v. Commissioner, 92 T.C. 101, 129↩ (1989).
16. Petitioners allege in their brief that respondent has the burden of proof with respect to the additions to their 1989 and 1990 gift taxes under sec. 6662(a) and (g). Petitioners contend that respondent bears this burden because she stated in her notices of deficiency that she determined the additions under sec. 6660, and restated in her answers that the determinations were made under sec. 6662(a) and (g). We disagree with petitioners that respondent bears the burden of proof on this issue. Although we agree with petitioners that respondent must prove any new matter pleaded in her answers, Rule 142(a), we do not agree with them that respondent's correction of her reference to former sec. 6662(a) and (g) is a new matter. Given the fact that respondent's notices clearly state that she determined valuation understatement penalties for 1989 and 1990, the mere fact that she mistakenly referred to the predecessor section (which mistake she quickly corrected in her answers) does not raise a new matter or otherwise shift the burden of proof. Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493↩ (1968).
17. Restricted stock is stock acquired from an issuer in a transaction exempt from the registration requirements of the Federal securities law. Transfers of restricted stock are generally restricted within the first 2 years after issuance.↩
18. See generally Pratt, Valuing a Business 238-247 (2d ed. 1989), for a discussion of studies on restricted stock transactions.↩
19. For this purpose, a nonreporting company is not required to file certain documents, such as quarterly disclosure reports, although it has stock which is publicly traded over the counter.↩
20. According to Grabowski, the Shareholders' Agreements "severely restrict" the marketability of Big M shares because the agreements contain a waiting period (with a right of first refusal) with respect to all sales of Big M stock to prospective buyers who are outside of the Mandelbaum family, and contain numerous provisions that minimize the possibility that such a buyer could ever vote on corporate matters or serve on the Board. Grabowski also concluded that an investor in Big M stock would demand a higher rate of return on his or her investment, as compared to an investment in a freely traded comparable company, because of the transferability restrictions embodied in the Shareholders' Agreements.↩
21. See generally Pratt, supra↩, for a discussion of studies on IPO's.
22. As mentioned infra↩ at 49, the period of time for which an investor must hold stock may affect the value of that stock.
23. We are also troubled by the fact that Grabowski failed to give these interviewees relevant information about the subject stock. See Commissioner v. Estate of Stewart, 153 F.2d 17↩ (3d Cir. 1946) (willing buyer and seller presumed to know all essential facts), affg. a Memorandum Opinion of the Court. Although Grabowski gave each of the interviewees selective information on the subject shares, Grabowski did not give the interviewees vital information that is extremely probative on the shares' value. This omitted information includes the names of Big M and its retail stores.
24. Because the parties used Big M's yearend statements to determine its freely traded values on these valuation dates, we do the same with respect to the marketability discount.↩
25. Accordingly, we do not pass on the other arguments made by petitioners with respect to the 1987 and 1988 additions to tax.↩